UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:16-cv-00193-FDW-DCK

| | | |
|---|---|---|
| THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY d/b/a CAROLINAS HEALTHCARE SYSTEM; CAROLINAS PHYSICIANS NETWORK, INC.; MANAGED HEALTH RESOURCES, INC., | ) ) ) ) ) ) | ORDER |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| OPTUMHEALTH CARE SOLUTIONS, INC., | ) ) ) | |
| Defendant. | ) ) | |

THIS MATTER is before the Court following a bench trial held before the undersigned on June 19-20, 2017. Plaintiffs brought this action against Defendant for breach of a transplant services contract and seeking a declaratory judgment regarding the construction of the contract. Essentially, the parties dispute the application of increased rates for transplant surgeries and an escalator clause included in a third amendment to the contract. The heart of this dispute is whether the increased rates and escalator clause apply to (1) all transplant services performed after the effective date of the amendment (Plaintiffs' position) or (2) only those transplant services provided to a patient whose initial consult took place after the effective date of the amendment (Defendant's position).

Following a hearing on April 6, 2017, the Court denied Plaintiffs' Motion for Summary Judgment (Doc. No. 59) concluding the contract was ambiguous. After hearing and weighing the evidence presented at trial, including documentary evidence and the testimony of seven witnesses

1

presented over two days, and reviewing both parties' proposed findings of fact and conclusions of law (Docs. No. 80, 81), the Court finds Plaintiffs have failed to establish by a preponderance of the evidence that Defendant breached the parties' contract.  The following constitutes the Court's findings of fact and conclusions of law.  <u>See</u> Fed. R. Civ. P. 52(a)(1).

## I.    FINDINGS OF FACT

### A. Background

1. Defendant and its predecessor in interest, United Resource Network ("U.R.N."), established and maintain a network of transplant centers.  Hospital transplant programs, such as that operated by Plaintiffs, contract with Defendant to be included in a transplant network that Defendant offers to certain payors, including large employer groups, reinsurers and health plans.  The payors contract with Defendant to obtain access to transplant services.  (Trial Tr. Vol. I, pp. 160-63.)

2. Under Defendant's contracts with both the payors and providers, the payor has the financial responsibility for all Transplant Health Services rendered by the provider.  (Pls.' Ex. No. 1, § 3.1.)

3. Providers submit claims for reimbursement for Transplant Health Services to Defendant, and Defendant adjudicates the claim according to the transplant services agreement with the provider.  Defendant forwards the claim to the payor with financial responsibility for the claim for payment based on the payment terms and rates set forth in the transplant services agreement.  (Trial Tr. Vol. I, p. 165.)

4. Transplant Health Services are expensive and can trigger stop loss or reinsurance provisions. (Trial Tr. Vol. I, pp. 164-65.)

5. Due to a patient's health status or having been placed on a wait list for an organ, several years may elapse between a patient's initial consult and the date the transplant surgery is performed. (Trial Tr. Vol. I, p. 165.)

6. Insurers and other payors require predictable Transplant Health Services costs to properly underwrite and establish reserves. (Trial Tr. Vol. I, pp. 164-65, 182.)

7. Relevant here, there are two types of pricing schemes that can be used for transplant services agreements:

    a. Under Case Effective Date pricing, the payment terms applicable to a patient, including the rate for the transplant surgery, become effective on the date of the patient's initial consult with the provider, and those payment terms continue to apply for the life of the case. (Trial Tr. Vol. I, pp. 166-68, 180, 198-99; Trial Tr., Vol. II, p. 43.)

    b. Under Date of Service pricing, the rates paid to a provider for services rendered to an individual patient are the rates in place at the time a transplant surgery is actually performed, regardless of the amount of time between the patient's initial consult with the provider and the time of surgery. (Id.)

**B. The Terms of the Original Transplant Services Agreement**

8. Effective April 22, 2005, Plaintiffs entered into a Transplant Services Agreement ("TSA") with U.R.N., Defendant's predecessor. (Pls.' Ex. No. 1.)

9. Russell Guerin signed the TSA for Plaintiffs on March 29, 2005, and Kevin O'Brien signed the TSA for U.R.N. on April 13, 2005. (Id.)

10. The TSA provided for coverage and payment of pre- through post-organ transplant services to covered transplant patients ("Members"), including the organ transplant itself. (Id.)

11. The relevant provisions of the TSA are as follows:

a. Section 1.3 of the TSA identifies three "Periods of Care" for a patient: "Pre-Transplant," "Transplant," and "Post-Transplant." (Pls.' Ex. No. 1.) Section 1.3 specifies when the three Periods of Care begin and end, but it does not delineate when the rates applicable to any Period of Care begin or end. (Trial Tr. Vol. I, pp. 201-02.)

b. Section 3.2 specifies the rate for the Transplant Period, which is called the "Case Rate Payment." A table in Section 3.2 lists the specific Case Rate for kidney, liver, and heart transplants. (Id.)

c. Section 1.2 specifically defines the Case Rate Payment as "The *fixed fee payment* made to Provider for Transplant Health Services provided to a Member during the Transplant Period" and "*represents payment in full for all such services*." (Id. (emphasis added).)

d. The last sentence of Section 2.2, which specifies when payment terms in the TSA attach and for how long, (Trial Tr., Vol. I, p. 200), provides: "The payment terms begin at the time of the Member's *Case Effective Date*, and not before, *and will continue to apply* as long as the Member is on Provider's active status to receive, or has already received, a Transplant." (Pls.' Ex. No. 1 (emphasis added).) Pursuant to Section 2.2, the Case Effective Date remains in place as long as the case is open, including through the transplant. (Trial Tr., Vol I, p. 174).

e. Section 1.1 of the TSA defines "Case Effective Date" as "the date the rates in this Agreement become effective for the Member's case, which shall be the earlier of the Member's initial consult with Provider for a transplant or the initiation of diagnostic testing related to the Transplant for the Member." (Pls.' Ex. No. 1.) The Case Effective

4

Date is a standard term that delineates the date on which reimbursement rates and other terms shift from the Member's underlying health plan to the TSA. (Trial Tr. Vol. I, pp. 167-68.)

    f.   The "payment terms" referenced in Section 2.2 are the payment terms contained in Section 3, which include rates applicable to Transplant Health Services rendered during each of the three Periods of Care. (Trial Tr. Vol. I, pp. 200-01.)

    g.   The last sentence of Section 7.1 of the TSA states: "Provider may give U.R.N. thirty (30) days prior written notice before the end of the term that Provider intends to renegotiate the reimbursement terms outlined in Section 3." (Pls.' Ex. No. 1.)

    h.   Finally, Section 7.2 of the TSA states, in part, that the agreement can be terminated "by either U.R.N. or [Plaintiffs] upon ninety (90) days prior written notice." (Id.)

12. Plaintiffs never invoked their rights under Section 7.1 of the TSA and did not seek to renegotiate the reimbursement terms outlined in Section 3 during the first seven (7) years of the parties' relationship. (Trial Tr. Vol. I, p. 175.)

13. Thus, between 2005 and 2013, the Case Rates in the TSA remained unchanged.

14. Plaintiffs also never terminated the TSA for any reason under Section 7.2, including dissatisfaction with reimbursement rates received under the TSA. (Trial Tr. Vol. I, p. 127.)

15. The terms of the TSA reflect that the parties intended and agreed to use a Case Effective Date, not Date of Service, pricing scheme. The specific terms of the TSA that reflect Case Effective Date pricing are the definition of Case Effective Date found in Section 1.1 and the last sentence of Section 2.2. (Trial Tr. Vol. I, pp. 166, 169, 202, 220, 239-40; Trial Tr. Vol. II, pp. 43-44).

16. Despite amending the TSA three times, as discussed in more detail below, the parties never amended or modified Sections 2.2 or 1.1. (Pls.' Ex. Nos. 2-4; Trial Tr. Vol. I, p. 78.)

17. A Date of Service contract typically uses specific language declaring that the contract is a Date of Service contract and, therefore, would contain different terms than those in the TSA.

    a. For example, a Date of Service contract would include a multi-year term with different rates for different time periods. (Trial Tr. Vol. I, pp. 202-03; Trial Tr. Vol. II, p. 44.)

    b. Also, in a Date of Service contract, the last sentence of Section 2.2 of the TSA would have been deleted and modified to state that the provider would be paid based on the rates in effect on the date of service (i.e., the transplant surgery). (Id.) Indeed, including the last sentence of Section 2.2 would not make any sense if the parties had intended Date of Service pricing because there would be no need to include a statement that rates continued to apply beyond the date of service. (Id.)

18. Susan Davis, an Assistant Vice President for Contracting and Payor Relations for Plaintiffs, could not identify a single managed care contract to which Plaintiffs are a party, including the TSA, that specifies the applicable rate is the rate in effect when the services are performed. (Trial Tr. Vol. I, pp. 82-83.) Davis testified that she "infers" date of service pricing for some contracts "without regards to the language of the contracts." (Id.)

19. Paul Harnett, another Assistant Vice President for Contracting and Payor Relations for Plaintiffs, also testified Plaintiffs have consistently "inferred" the existence of Date of Service pricing terms despite the absence of such terms in any agreement to which Plaintiffs are a party. (Trial Tr. Vol. I, p 124).

20. The TSA contains no language or terms stating Plaintiffs will be paid based on the rates in place at the time a transplant is performed.  (Pls.' Ex. 1.)

**C.  Negotiation and Drafting of the TSA**

21. The drafting and negotiation of the terms of the TSA show the parties intended and agreed to use Case Effective Date pricing, not Date of Service.

22. To begin negotiating and drafting the TSA, Defendant forwarded an initial draft of the agreement to Plaintiff, which was a template containing standard terms that were the typical starting point for negotiations with new potential providers.  (Def.'s Ex. No. 26; Tr. Vol. I, pp. 195-98.)  Although Defendant "created" the document, all terms in the template were "subject to negotiation" and any term could be modified as appropriate. (Id.)

23. The TSA was an extensively negotiated contract between two sophisticated commercial entities with equal bargaining power.  (Tr. Vol. I, pp. 172.)

24. Davis testified that Plaintiffs have "a large market share" and leverage in negotiating contracts.  (Tr. Vol. I, p. 82.)

25. The TSA contains a number of terms that were negotiated.  (Trial Tr. Vol 1, p. 172).

26. The initial draft of the TSA contained Case Effective Date pricing terms, including the definition of Case Effective Date in Section 1.1 and the last sentence of Section 2.2.  (Def.'s Ex. No. 26; Trial Tr. Vol. I, p. 198-199.)  Andrew Theodotou, who negotiated the TSA for Defendant, testified that these terms, which reflect Case Effective Date pricing, are included in the template to meet "the market needs with [Defendant's] payors [who] were requesting of [Defendant] pricing certainty as they move forward with a lengthy process of treatment."  (Id.)

Insurers and other payors require predictable Transplant Health Services costs to properly underwrite and establish reserves. (Trial Tr. Vol. I, pp. 164-65, 182.)

27. After Defendant forwarded an initial draft of the agreement to Plaintiff, the parties exchanged several redlined drafts of the agreement, (Def.'s Ex. Nos. 5, 20, 22, 26; Trial Tr. Vol. I, pp. 195-196), whereby both parties proposed changes to the terms of the TSA that were incorporated into the final agreement. (Def.'s Ex. No. 22; Trial Tr. Vol. I, pp. 204-06.)

28. The only witnesses with personal knowledge of the negotiation, drafting and intent of the original TSA who testified at trial were Andrew Theodotou, a U.R.N./Optum Contract Manager, and O'Brien. (Trial Tr. Vol. I, pp. 62-63, 114-115, 194-195; Vol. II, pp. 44-53.) No employee of Plaintiffs has personal knowledge of any discussions that occurred in connection with the negotiation, drafting and intent of the TSA, including any discussion regarding the pricing terms in the TSA, when rates became effective under the TSA and/or whether the rates could be subject to change after a patient's initial consult. (Trial Tr. Vol. I, pp. 115, 117.)

29. Plaintiffs proposed, and Defendant agreed to, adding certain provisions that show the parties' understood the TSA was based on Case Effective Date pricing.

   a. For example, O'Brien testified about a conversation he had with Russell Guerin, Plaintiffs' sole representative in the negotiations and a signatory to the TSA, in which Guerin expressed concern about the impact of pricing terms in the TSA, where rates were fixed at the outset of a patient's treatment and patients could remain on the waiting list for years. (Trial Tr. Vol. II, pp. 50-53.)

   b. Guerin was deceased at the time of this trial and was, therefore, unable to provide responsive testimony; however, based on O'Brien's testimony and the Court's

observation of his testimony, the Court finds O'Brien's testimony regarding their conversation credible and affords it significant weight in determining the intent of the parties.

c. In response to Guerin's concerns, Defendant agreed to add a stop loss provision proposed by Plaintiff in Section 3.2 of the executed TSA, which provides: "In no one case will Provider be paid less that forty-seven percent (47%) of Billed Charges ("Stoploss")." (Pls.' Ex. No. 1, § 3.2; Trial Tr. Vol. II, pp. 49-50.)

d. Plaintiffs also proposed, and Defendant agreed to, adding the portion of Section 7.1 allowing Plaintiffs to "give [Defendant] thirty (30) days prior written notice before the end of the term that [Plaintiffs] intend[ ] to renegotiate the reimbursement terms outlined in Section 3." (Pls.' Ex. No. 1, § 7.1; Trial Tr. Vol. I, pp. 219-20.)

30. Plaintiffs, however, did not propose changes to the definition of Case Effective Date or the last sentence of Section 2.2 and did not propose changing the terms of the TSA to include Date of Service pricing terms. (Trial Tr. Vol. I, pp. 206-07.)

31. During the negotiation and drafting of the TSA, Plaintiffs further proposed adding certain terms that were inconsistent with Case Effective Date pricing, and Defendant rejected those proposals, which were not included in the final TSA.

a. For example, Plaintiffs proposed changing Section 3.2 to add a stop loss provision that provided, in part:

> In the event that Billed Charges for the Transplant Period exceed the threshold dollar amounts below for a Member's Transplant procedure, <u>the Case Rate Payment in Section 3.2 shall no longer</u>

9

> apply. Provider shall receive sixty-eight (68%) of Billed
>
> Charges for all Transplant Health Services rendered during the
>
> Transplant Period.
>
> (Def.'s Ex. No. 22, § 3.2.1, p. 4) (emphasis added).)

    i.  Under this term proposed by Plaintiffs, when Billed Charges exceeded the proposed thresholds, the Case Rate would no longer apply and the payment terms would convert to Date of Service pricing. (Trial Tr. Vol. I, pp. 209-10.)

    ii.  Defendant rejected the proposed change because it was inconsistent with the predictable pricing desired by payors. (<u>Id</u>.)

b.  Plaintiffs also proposed the addition of Section 3.11, which provided:

> If Payor does not remit payment within sixty (60) days of receipt
>
> of claim from U.R.N., payment will be 100% of Billed Charges.
>
> (Def.'s Ex. No. 22, p. 7.)

    i.  Defendant rejected the proposal because it was inconsistent with Case Effective Date pricing and would have converted the TSA to a Date of Service contract in the event of an untimely payment. (Trial Tr., Vol I, p. 212-13.)

    ii.  Instead, in the final version of the TSA, in the event of an untimely payment, Plaintiffs could receive interest on the unpaid balance based on the Case Rate. (<u>Id</u>.)

c.  Plaintiffs also proposed including an escalator clause that described the pricing under the TSA as "fixed pricing" but did not specify that increased rates applied regardless of the Case Effective Date. (Def.'s Ex. No. 5, § 3.17, p. 7; Trial Tr. Vol. I, pp. 215-16.)

Defendant rejected the proposed change because it did not address the Case Effective Date pricing terms in the contract and was unnecessary in light of the one-year term of the agreement. (Pls.' Ex. No. 1; Trial Tr. Vol. I, pp. 216-17.)

32. O'Brien testified that the payment terms ultimately included in the TSA were very favorable to Plaintiffs compared to the hundreds of Defendant's other transplant services provider contracts. (Trial Tr. Vol. II, pp. 54-56).

33. In weighing the evidence, the Court gives the drafts and evidence of negotiations preceding the executed contract significant weight.

34. Plaintiffs presented evidence and testimony regarding the headings of certain sections in the TSA in an attempt to show how the placement of terms supports a Date of Service contract.

    a. For example, the term "Case Effective Date" makes no mention of the Case Rate or Section 3. This term is also listed only as a "General Definition," not with the Payment Terminology, the "[t]erms associated with the Case Rate and other payment provisions." (Pls.' Ex. No. 1.)

    b. O'Brien, who executed the TSA on behalf of Defendant, testified that one of the purposes of Section 2.2 was to make a clear distinction between patients receiving transplant health services under the TSA and patients who are being treated under their regular health insurance plan. (Trial Tr. Vol. II, p. 86-89). He testified that in making this distinction it is important to establish when a Member's coverage under the TSA begins and ends and that Section 2.2 defines the duration of the TSA. (Id.)

    c.  Section 2.2, which addresses "Member Referral and Status," appears in Section 2 of the Contract, which addresses "Provision of Health Services," not issues of payment. (Pls.' Ex. No. 1.)

    d.  Section 3 addresses "Payment for Health Services."  In addition to the Case Rates, this section includes other subsections addressing underpayments, overpayments, payment schedule, and a number of other terms regarding the rates under the TSA.

35.  Although the TSA does not contain a provision stating that the parties did not intend headings to be used in construing their contract, the Court has weighed the evidence and testimony and does not find the parties' use of certain headings or placement of terms is determinative as to the parties' intent regarding the pricing scheme of the contract.

36. Plaintiffs understood that the TSA was based on Case Effective Date pricing and that, in exchange for certain concessions by Defendant, including the stop loss provision and Plaintiffs' ability to renegotiate the reimbursement terms, Plaintiffs agreed that the rates under the TSA would become effective at the Case Effective Date and continue to apply throughout all three Periods of Care.

**D.** **Amendments to the TSA**

37. Section 8.8 of the TSA provides that the agreement may be amended with the written, mutual consent of the parties.  (Pls.' Ex. No. 1.)

38. On July 25, 2012, the parties executed a First Amendment to the TSA ("First Amendment"). (Pls.' Ex. No. 2.)

    a.  The First Amendment provided it was "effective July 26[th], 2012."

b. Relevant here, the First Amendment stated that "**The Case Rate Payment tables** [in Section 3.2 of the TSA] will be deleted in its entirety," and it included increased Case Rates that Defendant owed to Plaintiffs for transplant services provided by Plaintiffs.

c. It also stated: "**All other provisions of the [TSA] remain in full force and effect following the effective date of this Amendment.**"

39. The parties subsequently executed a Second Amendment to the TSA ("Second Amendment"), in which the parties agreed to extend the termination date of the First Amendment. It also stated: "**All other provisions of the [TSA] remain in full force and effect following the effective date of this Amendment.**" (Pls.' Ex. No. 3.)

40. On February 1, 2013, following several rounds of negotiation, the parties entered into a Third Amendment to the TSA ("Third Amendment"). (Pls.' Ex. No. 4.)

41. The main purpose of this Third Amendment was to negotiate new rates for the transplant organs. (Trial Tr. Vol. I, p. 32.)

42. Paul Bittner, a Senior Contract Manager for Defendant, testified he drafted the Third Amendment. (Trial Tr. Vol. II, p. 4.) Brennan McNally, Vice President of Network Solutions for Defendant, testified that while the Third Amendment included several provisions such as Section 2.2 that were "standard" in Defendant's contracts, the provisions increasing the payment rates were particular to Plaintiffs and that amendment. (Tr. Vol. I, pp. 190-91.)

43. Relevant here, the Third Amendment provides:

a. "**The Case Rate Payment tables** [in Section 3.2 of the TSA] will be deleted in its entirety and replaced with the following . . . ." This provision is followed by a table

listing the new, increased Case Rates, which are tens of thousands of dollars higher than the Case Rates in the TSA.  (Pls.' Ex. No. 4.)

    b. "All fixed rates in Section 3.2 and Section 3.3 [the Case Rates], shall be increased annually by five (5)%, starting on, January 1, 2014 and every year annually thereafter that this Amendment remains in effect."  (<u>Id</u>.)

    c. The Third Amendment was "effective February 1, 2013."  (<u>Id</u>.)

44. The Third Amendment resulted from extensive negotiations.  (Trial Tr. Vol. I, pp. 73-74.)  The terms of the Third Amendment were collaboratively drafted and were not unilaterally imposed by Defendant.  (<u>Id</u>.)  It was not a "take it or leave it" contract for Plaintiffs.  (<u>Id</u>.)

45. The executed Third Amendment included terms, such as the escalator clause, that benefited Plaintiffs.  (Pls.' Ex. No. 4; Trial Tr. Vol. I, p. 72.)

46. In negotiating and drafting the Amendments, Plaintiffs proposed terms that were inconsistent with a Case Effective Date pricing scheme, and Defendant again rejected those terms.  (Pls.' Ex. Nos. 2, 4.)

    a. For example, in connection with the negotiations preceding the Second Amendment, Plaintiffs again proposed to include an escalator clause but did not include a provision that specified the price increases would apply regardless of the patients' Case Effective Date.  (Def.'s Ex. No. 11; Trial Tr. Vol. I, pp. 245-47.)

    b. Plaintiffs also requested language drafted by Defendant that qualified the escalator clause and stated: "For cases already in the Transplant Period, the rate increase above will not take effect until the Transplant Period ends."  (Def.'s Ex. No. 11; Trial Tr. Vol. I, pp. 245-47; Trial Tr. Vol. II, p. 15.)

i. Defendant admitted that it drafted that language but included it in the draft by mistake. (Trial. Tr. Vol. II, p. 21-22.)

ii. Defendant communicated that it deleted the language by emailing a redlined draft to Plaintiff. Email was the method of sharing information during negotiations. (Id.)

iii. Davis, who negotiated the Third Amendment, testified she knew, based on the redlined draft of the Agreement, that Defendant had drafted and later deleted this language. (Trial. Tr. Vol. II, pp. 97-95.) She stated, however, that Defendant's deletion of the provision did not communicate anything to her regarding Defendant's understanding of the pricing scheme of the contract.

iv. Defendant deleted the proposed modification, which was not included in the Amendments, because it "was in conflict with the case effective date price methodology." (Trial Tr. Vol. I, pp. 245-48.)

47. Missing from the negotiations and drafting of the Third Agreement, or the final Third Agreement, is evidence that the parties intended to change from Case Effective Date pricing to Date of Service Pricing.

a. The parties did not discuss or agree to modify Section 2.2 of the TSA, and the Third Amendment does not modify either the definition of Case Effective Date in Section 1.1 or Section 2.2 of the TSA. (Pls.' Ex. No. 4; Trial Tr. Vol. I, pp. 78-80, 176, 247.)

b. The parties did not discuss making rate changes retroactive and did not agree the rates established by the Third Amendment would be applicable to Members with a Case

Effective Date prior to February 1, 2013, the effective date of the Third Amendment. (Trial Tr. Vol. I, p. 247.)

    c. The Third Amendment expressly states that "all other provisions of the [TSA] remain in full force and effect following the effective date of the [Third] Amendment." (Pls.' Ex. No. 4.) Therefore, the definition of Case Effective Date and the last sentence of Section 2.2 in the TSA remained in "full force and effect" after February 1, 2013. (Pls.' Ex. No. 4, p. 5; Trial Tr. Vol. I, pp. 79, 177.)

    d. The Third Amendment does not state that Plaintiffs would be paid for Transplant Health Services based on the rates in place on the date of the transplant surgery or that the reimbursement terms of the TSA were changed from Case Effective Date pricing to Date of Service pricing. (Trial Tr. Vol. I, pp. 248-49.)

    e. The Third Amendment did not change the time in which rates under the TSA become effective for any individual patient. (Trial Tr. Vol. I, p. 79-80.)

48. As a result, the Third Amendment changed rates applicable to patients with a Case Effective Date after February 1, 2013, the effective date of the Third Amendment; it did not impact rates applicable to Members with a Case Effective Date prior to February 1, 2013. (Trial Tr. Vol. I, pp. 185-86, 190, 248.) Therefore, after February 1, 2013, the payment terms contained in the original TSA continued to apply to Members with a Case Effective Date prior to February 1, 2013.

49. The phrase "delete in its entirety and replace" did not delete the rates applicable to Members with a Case Effective Date prior to the Third Amendment. (Pls' Ex. No, 4; Trial Tr., Vol I,

pp. 250-51.)  The phrase was limited to the provisions specifically addressed in the Amendment.  (<u>Id</u>.)

50. If the Third Amendment deleted and replaced rates applicable to patients with Case Effective Dates prior to the effective date of the Third Amendment, the last sentence of Section 2.2 would have been modified to specify that those patients with a Case Effective Date prior to February 1, 2013, would be subject to the new amended rates.  (Trial Tr. Vol. I, p. 234.)  Additionally, an extensive administrative process would have been put in place and various administrative changes would have been required.  (Trial Tr. Vol. I, pp. 251-52.)  Further, Defendant's clients would have to have been notified of such a change as they had booked rates based on the original agreement.  (<u>Id</u>.)  None of those administrative changes were made or discussed with Plaintiffs.  (<u>Id</u>.)

51. Davis and Harnett testified for Plaintiffs that, in their experience working with hospitals and insurers, no other insurer had taken the position that Defendant was advancing here, and every other entity with which Plaintiffs contracted for organ transplant services used a date of service model. (Trial Tr. Vol. I pp. 56; 130-31).

52. Glenn Getner, an employee for Plaintiffs who worked with hundreds of other health care providers as a consultant prior to joining Plaintiffs, similarly testified that he had never seen an insurer adopt Defendant's position that rates were fixed on the date of a patient's initial consult. (Trial Tr. Vol. I, p. 143.)

53. By contrast, McNally testified for Defendant that Case Effective Date pricing is common for transplant networks, which value predictability. (Trial Tr. Vol. I, p. 180-82.)

54. In the absence of expert testimony pursuant to Rule 702 of the Federal Rules of Evidence, and given that both sides focused more on standards within their own businesses than the industry at large, and that the testimony of the witnesses of each party largely offsets and contradicts the testimony of the other, the Court finds that the evidence presented regarding industry standard does not materially advance the position of either party. Testimony concerning contracts with other insurers or providers is marginally relevant given the TSA was a negotiated contract between two equal, sophisticated parties.

## E. Applicable Law

55. Section 8.7 of the TSA states that it shall be governed by "applicable state law" without providing that the law of a specific state will apply. (Pls. Ex. No. 1.) The parties stipulated in their pretrial order that Minnesota law governs based on the applicable choice of law rules.

## II. CONCLUSIONS OF LAW

For the reasons explained below, Plaintiffs have failed to prove by a preponderance of the evidence that the TSA, or any of its Amendments, required Defendant to pay Plaintiffs for Transplant Health Services based on the rates in effect at the time of the transplant surgery. Plaintiffs, therefore, have failed to prove Defendant materially breached the TSA or Third Amendment, as required for Count I of their Amended Complaint and are not entitled to the declaratory relief sought in Count II.

To succeed on a breach of contract claim under Minnesota law, Plaintiffs must establish "four elements: (1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages." Nelson v. Am. Family Mut. Ins. Co., No. 13-CV-607 (SRN/SER), 2017 WL 2773522, at *8 (D. Minn. June 26,

2017) (quoting Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd., 703 F.3d 1104, 1107 (8th Cir. 2013)). Plaintiffs have the burden of proving every essential element of their claim of by a preponderance of the evidence. Wick v. Widdell, 149 N.W.2d 20, 22 (Minn. 1967). Under Minnesota law, "the interpretation of an unambiguous contract presents a question of law." Gorog v. Best Buy Co., 760 F.3d 787, 793 (8th Cir. 2014). Here, however, the Court concluded that the TSA and Amendments are ambiguous regarding which rates apply to particular transplant patients. (Doc. No. 70, p. 22.)

"Where a written agreement is ambiguous or incomplete, [parol] evidence . . . tending to establish the intent of the parties is admissible." Ed Herman & Sons v. Russell, 535 N.W.2d 803, 807 (Minn. 1995) (citation omitted); Weyerhaeuser Co. v. Hvidsten, 129 N.W.2d 772 (Minn. 1964). Relevant extrinsic evidence includes evidence of the negotiations and circumstances surrounding the contract's formation, including prior drafts of the agreement exchanged during the course of negotiations. Donnay v. Boulware, 144 N.W.2d 711, 712 (Minn. 1966); Kane v. Oak Grove Co., 221 Minn. 500, 504, 22 N.W.2d 588, 590 (1946) ("Although preliminary negotiations cannot be allowed to contradict or vary the plain terms of a written contract purporting to integrate the entire transaction, nevertheless, where the terms or words used are ambiguous or reasonably susceptible of more than one interpretation, such negotiations may be considered in order to determine the meaning and intent of the parties.").

In addition, the Court must "construe a contract as a whole and attempt to harmonize all of its clauses." Storms, Inc. v. Mathy Constr. Co., 883 N.W.2d 772, 776 (Minn. 2016). "Each and every provision of a contract must be given effect if that can consistently and reasonably be done." Oster v. Medtronic, Inc., 428 N.W.2d 116, 119 (Minn. Ct. App. 1988) (citation omitted). "[A]ny

interpretation which would render a provision meaningless should be avoided . . . ." Independent Sch. Dist. No. 877 v. Loberg Plumbing & Heating Co., 123 N.W.2d 793, 799-800 (Minn. 1963).

Under Minnesota law, a contract may be construed against the drafter "if [the finder of fact] is unable to determine the intent of the parties based on all of the evidence" and "only as a last resort, after all other evidence fails to demonstrate the intent of the parties." Swift & Co. v. Elias Farms, Inc., 539 F.3d 849, 854 (8th Cir. 2008); see also Shaw Hofstra & Assocs. v. Ladco Dev., Inc., 673 F.3d 819, 828-829 (8th Cir. 2012); Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc., 896 N.W.2d 115, 139 (Minn. 2017). Further, the maxim does not apply where the parties collaborated in drafting the agreement. Indianhead Truck Line, Inc. v. Hvidsten Transp., Inc., 128 N.W.2d 334, 342 (Minn. 1964).

Here, the TSA and amendments resulted from arm's length negotiations between two sophisticated parties with equal bargaining power and experience negotiating complex provider services agreements. Although Defendant provided the initial draft to begin negotiations, Plaintiffs proposed several changes to the drafts of the TSA and the Amendments, including material financial terms such as the stop loss provision and the right to renegotiate payment terms. These terms, which Defendant accepted, were beneficial to Plaintiffs and incorporated into the TSA and the Third Amendment. Furthermore, there is substantial evidence from which the Court can discern the parties' intent, including testimony and previous drafts of the TSA and the Amendments. For these reasons, the Court does not construe the terms of the TSA against either Plaintiffs or Defendant.

Evidence concerning the negotiations and drafting of the original TSA confirms that the parties intended to use Case Effective Date, rather than Date of Service, pricing. Guerin's concern

about the fact that rates were set at the outset of patients' treatment and that patients could remain on the wait list for years demonstrates Plaintiffs' understanding that the TSA contemplated Case Effective Date pricing terms. In response to Guerin's concerns, Defendant agreed to include a stop loss provision that protected Plaintiffs in extraordinary cases and granted Plaintiffs the right to increase their Billed Charges annually. Likewise, in exchanging multiple drafts of the TSA, Defendants consistently rejected Plaintiffs proposed terms that were inconsistent with Case Effective Date pricing and consistent with Date of Service pricing. The unrebutted evidence offered at trial is that the parties never discussed: (1) eliminating the last sentence of Section 2.2, which provides: "The payment terms begin at the time of the Member's Case Effective Date, and not before, and *will continue to apply* as long as the Member is on Provider's active status to receive, or has already received a Transplant" (emphasis added); (2) altering or deleting the definition of Case Effective Date; or (3) changing the pricing methodology from Case Effective Date to Date of Service pricing.

Furthermore, the evidence of the negotiations and drafting of the Amendments to the TSA confirms that the parties intended and agreed that rates would be effective at the time of the Member's initial consult rather than on the date of the transplant surgery. In negotiating the Amendments, Plaintiffs once again proposed terms that were inconsistent with Case Effective Date pricing, and Defendant again rejected these proposals. The parties never discussed or agreed to modify Section 2.2 or the definition of Case Effective Date, and the Third Amendment does not purport to modify either.

Although the Third Amendment "deleted and replaced" Case Rates in the TSA with increased Case Rates, it did not modify Section 2.2 and, therefore, did not alter when rates attach

21

to an individual patient's case or the fundamental nature of the pricing methodology governing the parties' relationship. Moreover, the Third Amendment did not expressly purport to alter rates retroactively, nor did it expressly or by implication change payment terms applicable to cases pending prior to the effective date of the Third Amendment. Any contrary construction would read Section 2.2 out of the agreement. In addition, any construction that would result in Date of Service pricing would operate to read into the contract a term or provision that was not agreed upon or intended. As a result, the core contractual provisions that made the original TSA a Case Effective Date contract remained in "full force and effect" after February 1, 2013, the effective date of the Third Amendment. Accordingly, the new Case Rates in the Third Amendment are applicable only to patients with a Case Effective Date after the February 1, 2013.

Plaintiffs' contention that the parties' intended that the Third Amendment would delete the rates in the TSA and replace them with rates in the Third Amendment for all patients regardless of their Case Effective Date is inconsistent with the terms of the Third Amendment and the TSA when read as a whole, and the intent of the parties, as demonstrated through the negotiating and drafting process, does not support that interpretation. Accepting Plaintiffs' contention would require the Court to ignore the last sentence of Section 2.2—one of the core contractual provisions that delineated the TSA as a Case Effective Date contract. Ultimately, the Third Amendment does not state that Plaintiffs would be paid for Transplant Health Services based on the rates in place on the date of the transplant surgery, and Plaintiff has not presented sufficient evidence to show the parties intended to change the contract from Case Effective Date to Date of Service pricing.

The actual language of the TSA and Third Amendment, as well as the drafting history and negotiations preceding execution of the contracts, confirms that the parties intended to use Case

Effective Date, not Date of Service, pricing. This Court must enforce the terms of the contract as written and in a manner consistent with the evidence of the parties' objective manifestation of their intent. Therefore, the Court concludes Plaintiffs failed to establish that Defendant breached or is in breach of the TSA or the Third Amendment, and the Court finds in favor of Defendant on Plaintiffs' breach of contract claim and request for a declaratory judgment.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs have failed to satisfy their burden of proving that Defendant breached a contract. Plaintiffs, therefore, are not entitled to declaratory relief. Accordingly, the Clerk is directed to enter judgment in favor of Defendant in accordance with the above opinion and subsequently close the case.

IT IS SO ORDERED.

Signed: August 29, 2017

Frank D. Whitney
Chief United States District Judge